# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MANCHESTER BIDWELL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE CINCINNATI INSURANCE COMPANY,<br><br>Defendant. | Case No.: 2:21-cv-251<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Manchester Bidwell Corporation ("Plaintiff") brings this Complaint against Defendant The Cincinnati Insurance Company ("Defendant") and, upon information and belief, alleges as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Plaintiff and Defendant. Further, Plaintiff has suffered business losses in an amount greater than $150,000.00. The amount in controversy necessary for diversity jurisdiction over a declaratory judgment action is measured by the value of those business losses. *Id.* § 1332(a).

2. This Court has personal jurisdiction over Defendant. Defendant has engaged in substantial business in this District, including the formation of the Policy underlying Plaintiff's claims, and Defendant has therefore personally availed itself of jurisdiction in this District.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, including the formation of the Policy underlying Plaintiff's claims.

1

## PARTIES

4. At all relevant times, Plaintiff Manchester Bidwell Corporation is a New York non-profit corporation. Plaintiff provides art and music services to students and is located at 1815 Metropolitan St, Pittsburgh, PA 15233 ("Insured Property"). Plaintiff is a resident and citizen of Pennsylvania.

5. Defendant The Cincinnati Insurance Company is an insurance company with its headquarters and principal place of business in Ohio. Defendant transacts the business of insurance in Pennsylvania. Defendant is a resident and citizen of Ohio.

## FACTUAL ALLEGATIONS

### I. Insurance Coverage

6. At all relevant times, Defendant issued a policy to Plaintiff to cover business interruption loss from July 1, 2019 until July 1, 2020 for its business at the Insured Property. The policy number is EPP 049 77 98. This policy was intended to cover losses to business interruption. *See* Declaration, attached hereto as Exhibit 1 (the "Policy").

7. The Policy is currently in full effect in providing, among other things, personal property, business income loss and extra expense, civil authority, and other coverage.

8. Plaintiff submitted a claim for a loss pursuant to its Policy seeking coverage under this Policy. Defendant rejected Plaintiff's claim for coverage for business income loss and extra expense, civil authority, and other claims, contending, *inter alia*, that there was no physical loss or damage to Plaintiff's Insured Property or surrounding property.

9. Plaintiff faithfully paid policy premiums to Defendant, specifically to provide, among other things, additional coverages in the event of business income loss and extra expense or business interruption or closures by order of civil authority.

10. The Policy covers for damages resulting from business interruption when there is property damage, which is standard in most all-risk commercial property insurance policies, along with coverage for extra expenses.

11. The Policy also covers the actual loss of business income sustained and the actual, necessary, and reasonable extra expenses incurred when access to the Insured Property is specifically prohibited by order of civil authority as the direct result of a covered cause of loss to property in the immediate area of Plaintiff's Insured Property. This additional coverage is identified as coverage under "Civil Authority."

12. The Policy is an all-risk policy, insofar as it provides that a covered cause of loss, including but not limited to direct physical loss or direct physical damage, triggers unless the loss is specifically excluded or limited in the Policy.

13. An all-risk Policy such as that purchased by Plaintiff is one that protects against catastrophic events, such as the one occurring now, involving the global COVID-19 Pandemic that has resulted in the widespread, omnipresent, and persistent presence of COVID-19 in and around Plaintiff's Insured Property, including adjacent properties.

14. Coverage under an all-risk policy is to be broadly interpreted and provided, and exclusions are to be narrowly construed in favor of coverage.

15. There is no Virus Exclusion in the Policy, and thus, Plaintiff's claims are covered under the plain language of the all-risk Policy.

16. The language in the Policy is "adhesionary" in that Plaintiff was not a participant in negotiating or drafting its content and provisions.

17. Plaintiff was not a participant in negotiating or drafting the Policy's content and provisions. Plaintiff possessed no leverage or bargaining power to alter or negotiate the terms of

the Policy, and more particularly, Plaintiff had no ability to alter, change or modify standardized language derived from the ISO format.

18.     The presence of virus or disease can constitute physical damage to property, as the insurance industry has recognized since at least 2006. When preparing the Virus Exclusion, the ISO circulated a statement to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance),or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

19.     Plaintiff purchased the Policy with an expectation that it was purchasing a policy that would provide coverage in the event of a business interruption, such as that suffered by Plaintiff as a result of the COVID-19 Pandemic.

20.     At no time had Defendant or their agents notified Plaintiff that the coverage that Plaintiff had purchased pursuant to an all-risk policy that included business interruption coverage had exclusions and provisions that purportedly undermined the very purpose of the coverage—to provide benefits in the event of a business interruption.

21.     The reasonable expectations of Plaintiff—*i.e.*, an objectively reasonable interpretation by the average Policyholder of the coverage that was being provided—was that the Policy included coverage when a civil authority forced closure of the business for an issue of public safety such as that involving the COVID-19 pandemic in the immediate area surrounding the Insured Property.

22. The purported exclusions of the Policy that Defendant has or is expected to raise in defense of Plaintiff's claim under the Civil Authority coverage of the Policy are contradictory to the provision of Civil Authority coverage and violate public policy as a contract of adhesion and hence are not enforceable against Plaintiff.

23. Plaintiff is not seeking coverage because of personal injuries caused by the virus, but rather coverage for property damage, business income loss, and extra expense.

24. The civil authority orders prohibited access to Plaintiff's Insured Property, and the area immediately surrounding the Insured Property, in response to dangerous physical conditions described above resulting from COVID-19. As a result of the presence of COVID-19 and the civil authority orders, Plaintiff suffered business income loss and incurred extra expenses.

25. The Policy does not exclude the losses suffered by Plaintiff, and therefore, the Policy does provide coverage for the losses incurred by Plaintiff.

26. Based on information and belief, Defendant has accepted the policy premiums with no intention of providing any coverage for property damage, business income loss or extra expense, or Civil Authority orders.

27. Factual issues related to direct physical loss or damage to Plaintiff's Insured Property and/or surrounding property will require development of a factual record through discovery. Plaintiff also intends to serve subpoenas on the ISO and Department of Insurance regarding coverage under the Policy's standardized language.

**II.  The Coronavirus Pandemic**

28. The scientific community, and those personally affected by the virus, recognize the Coronavirus as a cause of real physical loss and damage. It is clear that contamination of the Insured Property would be a direct physical loss requiring remediation to clean the surfaces of the business.

29. The virus that causes COVID-19 remains stable and transmittable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel. *See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited April 9, 2020).

30. The CDC has issued a guidance that gatherings of more than 10 people must not occur. People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19.

31. On March 11, 2020 the World Health Organization ("WHO") made the assessment that COVID-19 shall be characterized as a pandemic. *See* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

32. The global Coronavirus pandemic is exacerbated by the fact that the deadly virus physically infects and stays on surfaces of objects or materials, "fomites," for up to twenty-eight (28) days. Human coronaviruses can remain infectious on inanimate surfaces at room temperature for up to 9 days. At a temperature of 30 degrees Celsius (86 degrees F) or more the duration of persistence is shorter. *See* https://www.ncbi.nim.nih.gov/pmc/articles/PMC7132493/ (last visited July 16, 2020).

33. A particular challenge with the novel coronavirus is that it is possible for a person to be infected with COVID-19 but be asymptomatic. Thus, seemingly healthy people unknowingly spread the virus via speaking, breathing, and touching objects.

34. While infected droplets and particles carrying COVID-19 may not be visible to the naked eye, they are physical objects which travel to other objects and cause harm. Habitable

6

surfaces on which COVID-19 has been shown to survive include, but are not limited to, stainless steel, plastic, wood, paper, glass, ceramic, cardboard, and cloth.

35. The virus is thought to spread mainly from person to person: between people who are in close contact with one another (within about 6 feet); through respiratory droplets produced when an infected person coughs, sneezes or talks; these droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs; and some recent studies have suggested that COVID-19 may be spread by people who are not showing symptoms. *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

36. The CDC has noted that "[i]t may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes, but this is not thought to be the main way the virus spreads." *See* https://www.cdc.gov/foodsafety/newsletter/food-safety-and-Coronavirus.html.

37. The CDC has said that the best way to prevent illness is to avoid being exposed to this virus and that steps can be taken to slow its spread: Maintain good social distance (about 6 feet). This is very important in preventing the spread of COVID-19; Wash your hands often with soap and water. If soap and water are not available, use a hand sanitizer that contains at least 60% alcohol; Routinely clean and disinfect frequently touched surfaces; and Cover your mouth and nose with a cloth face covering when around others.

38. "The primary and most important mode of transmission for COVID-19 is through close contact from person-to-person. Based on data from lab studies on COVID-19 and what we know about similar respiratory diseases, it may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes, but this isn't thought to be the main way the virus spreads."

https://www.cdc.gov/media/releases/2020/s0522-cdc-updates-covid-transmission.html (last edited May 23, 2020).

39. Compliance with the CDC recommendations, along with compliance with the civil authority orders, effectively made it impossible for Plaintiff to operate its business in the usual and customary manner causing the business to suffer business losses and added expenses as provided for and covered under the Policy

40. China, Italy, France, and Spain have implemented the cleaning and fumigating of public areas prior to allowing them to re-open publicly due to the intrusion of microbials.

41. A French Court has determined that business interruption coverage applies to the COVID-19 Pandemic. *See* https://www.insurancejournal.com/news/international/2020/05/22/569710.htm.

42. Similarly, on September 15, 2020, the United Kingdom's High Court found that the 'disease' and/or 'denial of access' clauses in the various insurance policy wordings provide coverage in the circumstances of the COVID-19 pandemic, and that the trigger for coverage caused policyholders' losses. The High Court further noted:

> The fact that a provision in a contract is expressed as an exception does not necessarily mean that it should be approached with a pre-disposition to construe it narrowly. Like any other provision in a contract, words of exception or exemption must be read in the context of the contract as a whole and with due regard for its purpose. As a matter of general principle, it is well established that that if one party, otherwise liable, wishes to exclude or limit his liability to the other party, he must do so in clear words; and that the contract should be given the meaning it would convey to a reasonable person having all the background knowledge which is reasonably available to the person or class of persons to whom the document is addressed.

https://www.fca.org.uk/publication/corporate/bi-insurance-test-case-judgment.pdf.

43. The determination by a Court of another country that coverage exists is consistent with public policy that in the presence of a worldwide Pandemic, such as COVID-19, businesses that possess business interruption insurance coverage should recover their losses from the insurance carriers.

### III. Civil Authority

44. On March 6, 2020, Pennsylvania Governor Tom Wolf issued a Proclamation of Disaster Emergency, the first formal recognition of an emergency situation in the Commonwealth of Pennsylvania as a result of COVID-19.

45. On March 19, 2020, Governor Wolf issued an Order requiring all non-life-sustaining businesses in the Commonwealth to cease operations and close all physical locations. Businesses that were permitted to remain open were required to follow "social distancing practices and other mitigation measures defined by the Centers for Disease Control." https://www.scribd.com/document/452416027/20200319-TWW-COVID-19-Business-Closure-Order (last visited April 19, 2019).

46. On April 1, 2020, Governor Wolf issued a Stay at Home Order to the entire Commonwealth of Pennsylvania.

47. On, May 8, 2016, Governor Wolf extended the Stay at Home Order for Delaware County until June 4, 2020.

48. The Orders were issued due to the presence of the coronavirus throughout the state, including causing physical loss and damage to property in and around Plaintiff's Insured Property.

49. The Pennsylvania Supreme Court recently clarified the Governor's Orders and supported Plaintiff's position that physical loss and damage exists throughout Pennsylvania. *See Friends of DeVito, et. al v. Wolf*, No. 68 MM 2020 (Pa. April 13, 2020).

50. Further, on April 10, 2020, President Trump seemed to support insurance coverage for business loss like that suffered by the Plaintiff.

> REPORTER: Mr. President may I ask you about credit and debt as well. Many American individuals, families, have had to tap their credit cards during this period of time. And businesses have had to draw down their credit lines. Are you concerned Mr. President that that may hobble the U.S. economy, all of that debt number one? And number two, would you suggest to credit card companies to reduce their fees during this time?
>
> PRESIDENT TRUMP: Well it's something that we've already suggested, we're talking to them. Business interruption insurance, I'd like to see these insurance companies—you know you have people that have paid. ***When I was in private I had business interruption.*** When my business was interrupted through a hurricane or whatever it may be, I'd have business where I had it, I didn't always have it, sometimes I had it, sometimes, I had a lot of different companies. But if I had it I'd expect to be paid. You have people. I speak mostly to the restaurateurs, where they have a restaurant, they've been paying for 25, 30, 35 years, business interruption. They've never needed it. All of a sudden they need it. And I'm very good at reading language. I did very well in these subjects, OK. And I don't see the word pandemic mentioned. Now in some cases it is, it's an exclusion. But in a lot of cases I don't see it. I don't see it referenced. And they don't want to pay up. I would like to see the insurance companies pay if they need to pay, if it's fair. And they know what's fair, and I know what's fair, I can tell you very quickly. But business interruption insurance, that's getting a lot money to a lot of people. And they've been paying for years, sometimes they just started paying, ***but you have people that have never asked for business interruption insurance, and they've been paying a lot of money for a lot of years for the privilege of having it, and then when they finally need it, the insurance company says 'we're not going to give it.' We can't let that happen***.

*See* https://youtu.be/_cMeG5C9TjU (last visited on April 17, 2020).

51. The President was articulating a few core points:

   a. Business interruption is a common type of insurance.

   b. Businesses pay in premiums for this coverage and should reasonably expect they'll receive the benefit of the coverage.

10

  c. This pandemic should be covered unless there is a specific exclusion for pandemics.

  d. If insurers deny coverage, they would be acting in bad faith.

52. These Orders and proclamations, as they relate to the closure of all non-life-sustaining businesses, evidence an awareness on the part of both state and local governments that COVID-19 causes damage to property. This is particularly true in places where business is conducted, such as Plaintiff's, as the requisite contact and interaction causes a heightened risk of the property becoming contaminated.

53. Plaintiff did not have the ability or right to ignore these civil authority Orders and proclamations as doing so would expose Plaintiff to fines and sanctions.

54. Plaintiff's adherence to the requirements of these civil authority Orders and proclamations was in furtherance of protecting the public, the public good, public policy in favor of minimizing the risk of spread of COVID-19, and complying with the civil authority Orders.

**IV. Impact on Plaintiff**

55. Plaintiff's business loss occurred when the state and local government issued orders that forced Plaintiff's business to shut down.

56. Prior to the issuance of the orders, Plaintiff's business was open.

57. Plaintiff has submitted a claim to Defendant related to such losses, but Defendant denied Plaintiff's claims.

58. In light of the Plaintiff's inability to safely use or operate its Insured Property due to the COVID-19 Pandemic, as well as state and local civil authority Orders requiring all non-life-sustaining businesses to cease operations and close all physical locations due to physical loss and damage caused by the COVID-19 Pandemic, Plaintiff was forced to suspend operations of its business.

59. Access to Plaintiff's business was prohibited by civil authority Orders.

60. The civil authority Orders entered by the state and local government were in the exercise of authority to protect the public and minimize the risk of spread of disease.

61. Even with the entry of these civil authority Orders, there remained physical impact not only in and within Plaintiff's business property but in and around the surrounding location of Plaintiff's business property in light of COVID-19 presence not being detectable other than through microscopic means, and occurrence of illness.

62. Plaintiff has suffered "direct physical loss of or damage" to its property due to the COVID-19 Pandemic. Among other things, COVID-19 made the Insured Property unusable in the way that it had been used before the Pandemic, rendered the property substantially unusable and uninhabitable, intruded upon the property, damaged the property, prevented physical access to and use of the property, and caused a suspension of business operations at the property.

63. The COVID-19 Pandemic also caused physical loss and damage to property near Plaintiff's Insured Property.

64. This loss is physical. Instead of being able to operate Plaintiff's business normally, the Insured Property was required to physically alter and drastically reduce operations, and even to close entirely. To do anything else would lead to the emergence or reemergence of COVID-19 at the location. Given the widespread prevalence of COVID-19, even limited use of the Insured Property was not reasonably safe for extended periods. The high probability of illness and contamination prevents the full physical use of the property.

65. Plaintiff's Insured Property is not a closed environment, and because people—staff, customers, community members, and others—constantly cycle in and out, there is an ever-present risk that the Insured Property is contaminated and would continue to be contaminated.

66. Businesses like Plaintiff's are more susceptible to being or becoming contaminated, as both respiratory droplets and fomites are more likely to be retained on the Insured Property and remain for far longer as compared to a facility with open-air ventilation.

67. Plaintiff's Insured Property is also highly susceptible to rapid person-to-property transmission of the coronavirus, and vice-versa, because the service nature of the business places staff and customers in close proximity to the property and to one another and because the nature of the business exposes people to high levels of respiratory droplets and fomites being released into the air of the property.

68. Because of the nature of COVID-19 as described above, relating to its persistence in locations and the prospect of causing asymptomatic responses in some people, the risk of infection to persons is not only high, but could cause persons with asymptomatic responses to then come into contact with others who would not be so fortunate as to suffer merely an asymptomatic response, and instead suffer serious illness.

69. The virus is physically impacting Plaintiff. Any effort by Defendant to deny the reality that the virus causes physical loss and damage would constitute a false and potentially fraudulent misrepresentation that could endanger Plaintiff and the public.

70. Plaintiff specifically sought coverage for business interruption losses and extra expenses and paid premiums for such coverage with an expectation that the Policy provided such coverage, with no disclosures to the contrary being made to Plaintiff by Defendant or their agents.

71. A declaratory judgment determining that the coverage provided under the Policy exists is necessary so as to prevent Plaintiff from being left without vital coverage acquired to ensure the survival of the business due to the shutdown caused by the civil authority Orders. As a

result of these Orders, Plaintiff has incurred, and continues to incur, among other things, a substantial loss of business income and additional expenses covered under the Policy.

## CAUSE OF ACTION

## DECLARATORY RELIEF

72. Plaintiff re-alleges and incorporates by reference into this cause of action each and every allegation set forth in each and every paragraph of this Complaint.

73. The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

74. An actual controversy has arisen between Plaintiff and Defendant as to the rights, duties, responsibilities and obligations of the parties in that Plaintiff contends and, on information and belief, Defendant disputes and denies that:

   a. Property in the area of the Insured Property has experienced direct physical loss or damage;

   b. The Orders constitute a prohibition of access to Plaintiff's Insured Property;

   c. The prohibition of access by the Orders has specifically prohibited access as defined in the Policy;

   d. Plaintiff had no choice but to comply with the civil authority Orders and suspend operations at the business;

   e. The Orders trigger coverage;

   f. The Policy provides coverage to Plaintiff for any current and future civil authority closures of a non-essential businesses due to physical loss or damage from the coronavirus under the Civil Authority coverage parameters; and

   g. The Policy provides business income coverage in the event that the coronavirus has caused a loss or damage at the Insured Property or immediate area of the Insured Property.

75.     Resolution of the duties, responsibilities and obligations of the parties is necessary as no adequate remedy at law exists, and a declaration of the Court is needed to resolve the dispute and controversy.

76.     Plaintiff seeks a Declaratory Judgment that property in the area of the Insured Property has experienced direct physical loss or damage.

77.     Plaintiff seeks a Declaratory Judgment that the Orders constitute a prohibition of access to Plaintiff's Insured Property.

78.     Plaintiff seeks a Declaratory Judgment that the prohibition of access by the Orders has specifically prohibited access as defined in the Policy.

79.     Plaintiff seeks a Declaratory Judgment that Plaintiff had no choice but to comply with the civil authority Orders and suspend operations at the business.

80.     Plaintiff seeks a Declaratory Judgment that the Orders trigger coverage.

81.     Plaintiff seeks a Declaratory Judgment that the Policy provides coverage to Plaintiff for any current and future civil authority closures of a non-essential businesses due to physical loss or damage from the coronavirus under the Civil Authority coverage parameters.

82.     Plaintiff seeks a Declaratory Judgment that the Policy provides business income coverage in the event that the coronavirus has caused a loss or damage at the Insured Property or immediate area of the Insured Property.

83.     Plaintiff does not seek any determination of whether the coronavirus is physically in or at the Insured Property, an amount of damages, or any other remedy other than declaratory relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff herein prays as follows:

    a. For a declaration that property in the area of the Insured Property has experienced direct physical loss or damage.

    b. For a declaration that the Orders constitute a prohibition of access to Plaintiff's Insured Property.

    c. For a declaration that the prohibition of access by the Orders has specifically prohibited access as defined in the Policy.

    d. For a declaration that Plaintiff had no choice but to comply with the civil authority Orders and suspend operations at the business;

    e. For a declaration that the Orders trigger coverage.

    f. For a declaration that the Policy provides coverage to Plaintiff for any current and future civil authority closures of a non-essential businesses due to physical loss or damage from the coronavirus under the Civil Authority coverage parameters.

    g. For a declaration that the Policy provides business income coverage in the event that the coronavirus has caused a loss or damage at the Insured Property or immediate area of the Insured Property.

    h. For such other relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands trial by jury.

Dated: February 22, 2021                                        Respectfully submitted,

                                                                         */s/ Daniel C. Levin*

                                                                         Arnold Levin, Esq.
                                                                         Laurence S. Berman, Esq.
                                                                         Frederick Longer, Esq.
                                                                         Daniel Levin, Esq.
                                                                         **LEVIN SEDRAN & BERMAN LLP**
                                                                         510 Walnut Street, Suite 500
                                                                         Philadelphia, PA 19106
                                                                         Telephone (215)592-1500
                                                                         Facsimile (215) 592-4663

Richard M. Golomb, Esq.
Kenneth J. Grunfeld, Esq.
**GOLOMB & HONIK, P.C.**
1835 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: (215) 346-7338
Facsimile: (215) 985-4169

Aaron Rihn, Esq.
**ROBERT PEIRCE & ASSOCIATES**
707 Grant Street, Suite 125
Pittsburgh, PA 15219
Telephone: (412) 281-7229
Facsimile: (412) 281-4229

W. Daniel "Dee" Miles, III, Esq.
Rachel N. Minder, Esq.
Paul W. Evans, Esq.
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
P.O. Box 4160
Montgomery, AL 36103
Telephone: (334) 269-2343
Facsimile: (334) 954-7555
Dee.Miles@BeasleyAllen.com
rachel.minder@beasleyallen.com
Paul.Evans@BeasleyAllen.com

*Attorneys for Plaintiff*